# EXHIBIT E

Ernest Wilson, Wednesday, May 26, 2004

```
              UNITED STATES DISTRICT COURT

          FOR THE EASTERN DISTRICT OF MICHIGAN

                    SOUTHERN DIVISION

                       *   *   *


NATHANEAL TAYLOR,

              Plaintiff,


      - vs. -              Case No. 03-73595

                           Hon. Paul Borman

CITY OF DETROIT, GREG EDWARDS;

BARBARA SIMON; ERNEST WILSON;

TERRILL SHAW; JAMES FISHER;

DWIGHT PEARSON; Individually and

in their official capacities,

jointly and severally.

_____Defendants._____/

DEPONENT:      ERNEST WILSON

DATE:          Wednesday, May 26, 2004

TIME:          9:48 a.m.

LOCATION:      660 Woodward, Suite 1650

               Detroit, Michigan  48226

REPORTED BY:   JENNIFER DIANE CLAUSON, CSR-6867

               Clauson & Carnegie Court Reporting, L.L.C.

               Telephone (248) 683-8516
```

Clauson & Carnegie Court Reporting   248.683.8516   -   248.683.7923

1

Ernest Wilson, Wednesday, May 26, 2004

1  Q. Okay. Any other times you've interviewed with any other
2     Michigan State police officials?
3  A. No, sir.
4  Q. Have you ever arrested a witness on an outstanding warrant,
5     placed them on the eighth or ninth floor, and then released
6     them without arraigning them, having them arraigned?
7  A. I've arrested many people under -- under warrants and placed
8     them in precincts, ninth floor, any facility that Detroit
9     has available and let the courses take his action. If they
10    go to court, they go to court.
11 Q. Okay. Have you ever directed someone to be released before
12    they were arraigned?
13 A. No.
14 Q. Okay. Have you ever arrested a witness?
15 A. I have arrested people as witnesses, yes.
16 Q. Okay. And on what basis?
17 A. On the basis they may be associated or affiliated with the
18    crime of which I'm arresting -- arresting them for as to
19    accessory to murder.
20 Q. Okay.
21 A. Under those clauses or that they had a felony warrant or
22    misdemeanor warrant under the jurisdiction in the State of
23    Michigan.
24 Q. Okay. Forget about the warrants. We've covered that. You
25    would have absolute right to arrest someone on a warrant,

Ernest Wilson, Wednesday, May 26, 2004

1   correct?
2   A. Correct.
3   Q. Whether they're a witness, whether they're committing a
4      crime, or whatever, right?
5   A. Correct.
6   Q. With respect to a witness, if you're going to arrest a
7      witness, you would have to have probable cause to arrest
8      them, correct?
9   A. If I'm going to arrest anyone, I have to have probable cause
10     to arrest them. Using the word "witness" --
11  Q. Right.
12  A. -- is an -- is not a word that you can associate with an
13     arrest because if I'm arresting on probable cause, that
14     person is going to be looked at as a suspect.
15  Q. Exactly. So you can't arrest witnesses, can you? Unless
16     they have a warrant?
17  A. Not exactly as you say it. You can't arrest witnesses. The
18     word "witnesses" I don't arrest.
19  Q. Okay. That would be improper, wouldn't it? To arrest a
20     witness?
21  A. Correct.
22  Q. Okay. Have you ever arrested a witness who doesn't have a
23     warrant?
24  A. No.
25  Q. You haven't, correct?

Ernest Wilson, Wednesday, May 26, 2004

1  A. If there's a restriction on an individual, I believe it's a
2     line column in one of the books that says; restrictions.
3  Q. Okay. When Mr. Taylor in this case was brought in
4     originally I believe on the 27th of -- strike that.
5             When Mr. Taylor was brought in
6     originally on the 29th of March of the year 2000, do you
7     know if the officers who brought him in had probable cause
8     to arrest him?
9  A. Yes.
10 Q. Did they have probable cause to arrest him?
11 A. In reviewing the paperwork and everything, yes.
12 Q. What was their probable cause?
13 A. The probable cause was the fact that there was an argument
14    that was described by a gentleman I believe by the name of
15    Willie Maddox between Mr. Taylor and the individual who was
16    dead.
17 Q. Okay.
18 A. Also another individual, Louis, whatever his name is, Louis
19    Lee was with him and the person was described as by Mr.
20    Maddox as an individual that he looked or described as a
21    retarded person which Mr. Louis has multiple sclerosis. So
22    he would walk in a -- in a fashion that was not normal for
23    the healthy individual.
24 Q. Okay.
25 A. And in talking with Louis Lee -- Lewis Lee, whichever way he

Ernest Wilson, Wednesday, May 26, 2004

1  Q.  Okay.
2  A.  -- I'm explaining to you that the question that you asked me
3      is not a question of facts.  So --
4  Q.  I'll offer you --
5  A.  -- if you're going to be asking me questions of theory, let
6      it be only questions of theory, but ask me a question of
7      fact.
8  Q.  Okay.
9  A.  If you're going to ask me did I give the officers the order
10     to lock him up?  No, I did not give the officers the order
11     to lock him up because I hadn't had the case yet.
12 Q.  Okay.  Once again, if you want, I'll --
13 A.  I don't want to entertain that thought there.  So let's get
14     back to the case.
15 Q.  Okay.  I'll offer you every opportunity, okay?
16 A.  Let's get back to the case.
17 Q.  Okay.  So let's go back and once again, you told me point
18     blankly that you would have arrested him because you know
19     you had probable cause based upon the statement of Willie
20     Maddox and Louis Lee?
21 A.  That's correct.
22 Q.  Okay.  You didn't get those statements until the day after
23     Mr. Taylor's arrest, correct?
24 A.  I didn't get anything dealing with the case until the next
25     morning.

Ernest Wilson, Wednesday, May 26, 2004

1  A. Okay. They probably talked to people out there that I don't
2     know. You don't know. Kids in the street. Old ladies in
3     the street. Anybody that doesn't want to be identified.
4     I'm sure that the homicide investigators did an
5     investigation to where they brought in names and persons
6     that are involved with this homicide. They make the
7     decision on the probable cause. Not my opinion afterwards
8     many years later. My opinion means nothing --
9  Q. Okay.
10 A. -- for those days of the 29th of that month and year that
11    you're talking about. My opinion means nothing for what
12    their probable cause was.
13 Q. Do you know if probable cause existed to bring Nathaneal
14    Taylor in on the 29th of March of 2000?
15 A. Yes, I do believe there was.
16 Q. Okay. And tell me what that probable cause was.
17 A. Based upon the investigation he was involved with the party
18    in an argument.
19 Q. Okay.
20 A. And he said that this is not finished. Based upon that
21    argument, he was identified as the individual that was
22    having an argument with him.
23 Q. Okay. Who did he tell this is not finished to?
24 A. He said that out loud to where Mr. Willie Maddox heard him
25    say it.

Ernest Wilson, Wednesday, May 26, 2004

```
 1      it major crime division like armed robbery.  Sex crimes.
 2  Q.  Right.
 3  A.  It would -- it would be basically upon the person who's in
 4      charge of the case or the person who's overseeing the case
 5      at that time.  There's no particular guideline to say I'm
 6      taking them to seven, 13, or six or wherever compared to the
 7      ninth floor.  If I'm talking to that person, I want to talk
 8      to that person then, I would have that person brought to the
 9      ninth floor.
10  Q.  Okay.  Even if they're just coming down as a witness?
11  A.  If a person's coming down as a witness, they're coming down
12      to talk with us.  They wouldn't be placed on the ninth floor
13      or the eighth floor.
14  Q.  There would be no reason to do that, would there?
15  A.  No.
16  Q.  Okay.  And if that occurred, then that would be totally
17      inappropriate, right?
18  A.  If that occurred.
19  Q.  Okay.  Tiffany Davis, Tiffany Lee, the young lady who was
20      living with Mr. Taylor, was she placed into the eighth or
21      ninth floor holding cell?
22  A.  Yes, she was.
23  Q.  For what reason?
24  A.  She was placed up there due to the fact that I felt that
25      she's an accessory to the crime based on the fact that there
```

Ernest Wilson, Wednesday, May 26, 2004

1 and who puts it on him is whoever entered him on the ninth
2 floor.
3 Q. Whoever signed his arrest card, right?
4 A. Would be yes.
5 Q. Okay. So if Pearson signed his arrest card, then --
6 A. Well, let's clarify that.
7 Q. Okay.
8 A. Not exactly whoever signed his arrest card. Who initiated
9 the arrest because the person who may have made the decision
10 to have him brought in, could have said; Pearson, can you
11 make sure he gets signed in upstairs? Pearson could be the
12 lowest person on the totem pole in that time squad at the
13 time and he's asked by the sergeant or the lieutenant; can
14 you take him and register him on nine? That doesn't mean
15 the Pearson made the call to have him -- have him brought in
16 under a homicide hold, no.
17 Q. Mr. Taylor gave a witness statement. What does that
18 indicate to you?
19 A. Indicate that that's what we write things on.
20 Q. He wasn't --
21 A. You can give me a confession and I'll put it on a witness
22 statement.
23 Q. He wasn't given a constitutional rights form to sign either.
24 What does that indicate to you?
25 A. That indicates that that's a decision made by whoever talked

Ernest Wilson, Wednesday, May 26, 2004

1  officer.
2  Q. If there's no reason to hold Mr. Taylor and he has a hundred
3  and eighty-six dollar traffic warrant, should he be allowed
4  to pay that and leave?
5  A. And you said the magic thing if.
6  Q. Right. If?
7  A. If he's been allowed to leave. If.
8  Q. Okay. He should be allowed to make a phone call to have
9  someone come down and pay the $186, correct? If there's no
10 hold on him, right?
11 A. Well, we're not -- we're not in the if thing because that if
12 wasn't the situation.
13 Q. Okay. If that were the case, correct?
14 A. If Matti Jean came in and she only had a hundred and six --
15 a hundred and eighty-six dollar traffic warrant and that's
16 all she had, she would be let go, but if she had a homicide
17 hold, no. It wouldn't matter. Why waste your $186?
18 Q. Okay. In order to have a homicide hold, you would have to
19 have probable cause, correct?
20 A. Correct.
21 Q. Okay. And you would never place a homicide hold on a
22 witness, would you?
23 A. No, I don't.
24 Q. That would be a false imprisonment, wouldn't it?
25 A. It would be a wrong decision by me.

Ernest Wilson, Wednesday, May 26, 2004

1  Q. Okay. Would it be false imprisonment to do so?
2  A. I don't know if you can exactly say false imprisonment.
3  Q. Would it be a violation of the person's constitutional
4     rights?
5  A. I don't think in all hands. Sometimes it's a mistake.
6  Q. Okay.
7  A. Everything's not always a full violation.
8  Q. Okay. But either it's a mistake or it's a violation of the
9     person's constitutional rights, correct?
10 A. You could pretty much say that. I'm not here to recite law
11    and everything. That's someone else's thing, but I'm not
12    going to recite law.
13 Q. Would you agree with me on that though?
14            MS. COLE: Objection as to the form of the
15    question and asked and answered several times.
16 Q. (BY MR. TRAINOR): Go ahead. Would you agree with me on
17    that?
18 A. Not fully.
19 Q. Okay. What else -- what else would there be?
20 A. I don't know. I would have to go and read -- read a little
21    bit more to get my head into it today.
22 Q. Okay. You're a police officer?
23 A. But I can pretty much almost agree with you.
24 Q. Okay.
25 A. There are things that violates people's rights and that

Ernest Wilson, Wednesday, May 26, 2004

1  Q. Okay.
2  A. The third reason is I'm going to go search his house.
3  Q. Okay.
4  A. The fourth reason is I'm going to give him the respect and
5     let him know if I did find anything or didn't find anything.
6  Q. Okay.  You're going to come back and tell him I'll be back.
7     Did you ever tell him I'll be back.  You better tell me
8     right now whether you did this or not so I can go easy on
9     you?
10 A. No.
11 Q. You wouldn't do that?
12 A. No.
13 Q. Did Mr. Taylor ever ask you for phone calls to his father,
14    his girlfriend, or anybody else?
15 A. No.
16 Q. Okay.  Did you ever promise him a phone call to anybody --
17 A. No.
18 Q. -- if he gave a statement?
19 A. No.
20 Q. You never told him you can go home if you just give me a
21    statement?
22 A. No.
23 Q. Going back, you became aware of Mr. Ross after Mr. Taylor
24    signed the consent to search form, correct?
25 A. Correct, sir.

Ernest Wilson, Wednesday, May 26, 2004

1  Q.  Okay. And you became aware of Mr. Ross through you believe
2      someone who was on the ninth floor?
3  A.  It had to be someone that worked the ninth floor.
4  Q.  Okay. And at that time, would you have assigned another
5      investigator to get Mr. Ross' statement or would you have
6      gone and talked to Mr. Ross?
7  A.  I would have most likely assigned someone else or whoever's
8      available depending on exactly what I was doing.
9  Q.  Okay. Up in --
10             MS. COLE:  Chris, can we find out about your
11     client? Really because my court reporter too cancelled a
12     job and I promised her if there was any change, I would call
13     her too. So I would really like to find out if your
14     client's going to be here today. Thanks a lot.
15                  (Off the record at 11:29 a.m.)
16                  (Deposition concluded at 11:43 a.m.)